**UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA**

JENNIFER LYNN GEISER,

      Plaintiff

      v.

MICHAEL J. ASTRUE, COMMISSIONER
OF SOCIAL SECURITY,

      Defendant

:
:
:
:
:
:
:
:
:
:

No. 4:10-CV-1973

(Judge Nealon)

FILED
SCRANTON

JUL 2 6 2011

PER _____
        DEPUTY CLERK

### MEMORANDUM and ORDER

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Jennifer Lynn Geiser's ("Geiser") claim for social security disability insurance benefits and supplemental security income benefits. For the reasons set forth below we will affirm the decision of the Commissioner.

Disability insurance benefits ("DIB") are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Geiser meets the insured status requirements of the Social Security Act through December 30, 2012. (Tr. 13).[1]

Supplemental security income ("SSI") is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other individuals who have little or no income. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Geiser was born in the United States on December 26, 1975.[2] (Tr. 108, 116). Geiser graduated from high school and attended one year of college. (Doc. 13). Geiser's prior relevant

---

1. References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of his Answer on November 29, 2010.

2. Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

employment[3] was as a machine operator, which is semiskilled, medium work and as a

phlebotomist, which is semi skilled, light work.[4]  (Tr. 19).  Records from the Social Security

Administration reveal that Geiser had employment and earnings as follows:

| | |
|---|---|
| 1992 | $ 652.38 |
| 1993 | 2032.18 |
| 1994 | 1549.99 |
| 1995 | 2996.82 |
| 1996 | 8948.13 |
| 1997 | 12768.73 |
| 1998 | 14663.88 |

---

3 .    Past relevant employment in the present case means work performed by the Plaintiff during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

4 .    The terms sedentary, light and medium work are defined in the Social Security regulations as follows:

(a) *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) *Light work.*  Light work involves lifting no more than 20 pounds at a time        with frequent lifting or carrying of objects      weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as of fine dexterity or inability to sit for long periods of time.

(c) *Medium work.*  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

20 C.F.R. §§ 404.1567 and 416.967.

| | |
|---|---|
| 1999 | 15614.88 |
| 2000 | 16040.08 |
| 2001 | 11447.14 |
| 2002 | 5302.74 |
| 2003 | 4122.23 |
| 2004 | 8656.24 |
| 2005 | 17074.14 |
| 2006 | 18531.68 |
| 2007 | 12396.33 |
| 2008 | 0.00 |

(Tr. 125). Geiser's total earnings between 1992 and 2007 were $152,797.57. Geiser has not worked since March 7, 2009.[5]  (Tr. 187).

---

5 .   According to the administrative law judge:

The claimant has not engaged in substantial gainful activity between the time period of March 18, 2007 the alleged onset date through August 2008.  Thereafter the claimant returned to work wherein she received wages that rose to the level of substantial gainful activity (20 CFR 404.1571 *et. seq.*, and 416.971 *et. seq.*).

In this case, the claimant alleged that she was disabled as of March 18, 2007. Upon review of the earnings record, the claimant received $12,396.33 in 2007. The claimant earned $5,471.33 in the first Quarter of 2007 prior to the alleged onset date.  The balance of $6,925.00 in 2007 is compensation from an insurance company; this is unearned income and therefore is not substantial gainful activity. (Exhibit 4D/8).

The earnings record shows that the claimant earned $1,195.00 in the 1st Quarter of 2008.  Since this may have been earned in just one month during that quarter, I find that this can be considered an unsuccessful work attempt.

With regard to the time period as of August 2008 the earnings record shows that the claimant received $1,113.00 in the 3rd Quarter of 2008.  The earnings record also reflects that the claimant earned $3,994.00 in the 4th Quarter of 2008.

Pursuant to 20 CFR 404.1572, substantial work activity is defined as work that involves doing significant physical or mental activities.  Work can be considered substantial even if it is done on a part-time basis or if less money is earned or work responsibilities are lessened from previous employment.  Gainful work activity is the kind of work usually done for pay or profit, whether or not a profit is realized.  Criteria for evaluating whether work as an employee constitutes substantial gainful activity are set forth in 20 CFR 404.1574.  In evaluating the claimant's work activity for substantial gainful activity purposes under 20 CFR 404.1574(a)(1), the undersigned gives primary consideration to the earnings the

(continued...)

3

Geiser claims that she became disabled on March 18, 2007, because of a cerebral stroke[6], an arteriovenous malformation[7] ("AVM"), a patent foramen ovale[8], headaches, fatigue, dizziness,

---

5.    (...continued)
      claimant derives from the work activity. Effective January 1, 2008, the
      appropriate amount for substantial gainful activity was increased to $940. (20
      CFR 404.1574(b)(2) and POMS DI 10501.015).

      As a result of the claimant returning to work as of August 2008 with earnings in
      excess of $940.00 per month the claimant is considered not disabled as a result of
      her ability to perform substantial gainful employment as of that date. Although
      the claimant's counsel argued that a trial work period would be applicable if I find
      that the claimant exceeded nine months of substantial gainful activity as a result
      of her work both in the beginning of 2008 and the work she commenced in
      August 2008 through the date of the hearing.

      A trial work period (TWP) is a period to give disabled claimants the opportunity
      to test their ability to work for up to nine months within a 60-consecutive month
      period without fear of losing their benefits (20 CFR 404.1592).

      Since the claimant had a time period in excess of twelve months from the alleged
      onset date through August 2008 I am proceeding with the sequential evaluation
      process with regard to my evaluation of her disability claim.

(Tr. 12-13).

6.    "A stroke is caused by blockage of a cerebral artery by a clot forming in it (thrombus) or
reaching it from elsewhere (embolus) or bleeding from an artery into brain tissue."
http://www.depression-guide.com/cerebral-stroke.html (Last accessed July 13, 2011).

7.    "Arteriovenous malformations (AVMs) are defects of the circulatory system that are
generally believed to arise during embryonic or fetal development or soon after birth."
http://www.ninds.nih.gov/disorders/avms/avms.htm (Last accessed July 13, 2011).
"Occipital arteriovenous malformations (AVMs) cause a variety of visual disturbances and
headaches." http://www.neurology.org/content/46/4/953.short (Last accessed July 13, 2011).

8.    "While a baby grows in the womb, there is a normal opening between the left and right
atria (upper chambers) of the heart. If this opening fails to close naturally soon after the baby is
born, the hole is called patent foramen ovale (PFO). This condition is not treated unless other
heart abnormalities exist or if you had a stroke caused by a blood clot to the brain. Unless there
are other associated defects, there are usually no complications associated with a PFO. There
have been some studies suggesting that older patients with PFOs have a higher rate of a certain
type of stroke (called paradoxical thromboembolic stroke). The reason for this is that older
people frequently develop blood clots in the veins in their legs. These clots can sometimes travel
from their original site to the right side of their heart."
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002102/ (Last accessed July 13, 2011).

loss of vision in the right eye, depression, bilateral carpal tunnel syndrome, and left knee arthritis.

On June 18, 2007, Geiser protectively filed an application for disability insurance and supplemental security income benefits. (Tr. 108-122). On August 24, 2007, the Bureau of Disability Determination denied Geiser's applications. (Tr. 86-87).[9] On September 17, 2007, Geiser requested a hearing before an administrative law judge. (Tr. 98). After approximately sixteen months had passed, a hearing was held on January 19, 2009, before an administrative law judge. (Tr. 22-78). On May 12, 2009, the administrative law judge issued a decision denying Geiser's applications for benefits. (Tr. 7-20). On June 30, 2009, Geiser filed a request for review of the decision with the Appeals Council of the Social Security Administration. (Tr. 6). Thirteen months later, on July 21, 2010, the Appeals Council concluded that there was no basis upon which to grant Geiser's request for review. (Tr. 1-5). Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

On September 22, 2010, Geiser filed a complaint in this court requesting that we reverse the decision of the Commissioner denying her disability insurance and supplemental security income benefits. The Commissioner filed an answer to the complaint and a copy of the administrative record on November 29, 2010. After two extensions of time within which to file a brief were granted, Geiser filed her brief on March 17, 2011, and the Commissioner filed his brief on April 19, 2011. Geiser elected not to file a reply brief, thus the appeal[10] became ripe for disposition on May 6, 2011.

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91

---

9. The Bureau of Disability Determination is an agency of the Commonwealth of Pennsylvania which initially evaluates applications for DIB and SSI benefits on behalf of the Social Security Administration. (Tr. 87).

10. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

(3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001);  Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from

its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

Another critical requirement is that the Commissioner adequately develop the record. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)("The ALJ has an obligation to develop the record in light of the non-adversarial nature of benefits proceedings, regardless of whether the claimant is represented by counsel."); Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005); Fraction v. Bowen, 787 F.2d 451, 454 (8th Cir. 1986); Reed v. Massanari, 270 F.3d 838, 841 (9th Cir. 2001); Smith v. Apfel, 231 F.3d 433. 437 (7th Cir. 2000); see also Sims v. Apfel, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000)("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"). If the record is not adequately developed, remand for further proceedings is appropriate. Id.

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work

> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work. For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in significant
> numbers either in the region where such individual
> lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and

supplemental security income claims. See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920;

Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity,[11] (2) has an impairment that is

severe or a combination of impairments that is severe,[12] (3) has an impairment or combination of

impairments that meets or equals the requirements of a listed impairment,[13] (4) has the residual

---

11. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 404.1510 and 20 C.F.R. § 416.910.

12. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b). An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

13. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or

(continued...)

functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy.  Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity.  Id.[14]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

At the first step of the sequential evaluation process the administrative law judge found that Geiser had not engaged in substantial gainful activity from the alleged onset date through August 2008, after which time she did engage in substantial gainful activity (as noted above in footnote 5). (Tr. 12).

At step two the administrative law judge found that Geiser has the following severe impairment: "left occipital arterio-venous malformation, obesity, bilateral carpal tunnel syndrome, cerebral vascular accident, chronic fatigue, depression, right eye vision loss [and] headaches."  (Tr. 13).

At step three the administrative law judge found that Geiser's impairments did not individually, or in combination, meet or equal a listed impairment.  (Tr.  14).

---

13.   (...continued)
combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

14.   If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

The administrative law judge found at step four that Geiser is unable to perform any past relevant work, but has the residual functional capacity to

> [p]erform light work as defined in 20 CFR 404.1567(b) and 416.967(b). She is limited to occupations that require no more than occasional postural maneuvers, such as balancing, stooping, kneeling, crouching, crawling, and climbing on ramps and stairs. She must avoid occupations that require climbing on ladders. The claimant must avoid occupations that require fine fingering [gross handling preserved], overhead reaching, feeling, pushing and pulling with the upper extremities to include the operation of hand levers. The claimant must avoid occupations with prolonged writing or keyboard work. She is limited to occupations which do not require exposure to dangerous machinery and unprotected heights. The claimant is also limited to occupations that do not require peripheral visual acuity or depth perception. The claimant is limited to occupations requiring no more than simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and in general, relatively few work place changes. She is limited to occupations which require no more than occasional interaction with supervisors, coworkers and members of the general public. This residual functional capacity is applicable during the period when the claimant was not engaging in substantial gainful activity and also during the period that she was working.

(Tr. 15).

At step five, the administrative law judge found that there are jobs that exist in significant numbers in the national economy that Geiser can perform, such as that of garment trimmer, tagger and video monitor. (Tr. 19-20).

The administrative record in this case is 833 pages in length and we have thoroughly reviewed that record.

Geiser brings four bases for appeal. First, Geiser argues that the administrative law judge erred in rejecting the opinion of treating neurologist, John P. Carlson, M.D. Second, Geiser argues that the administrative law judge erred by not including her headaches and fatigue in his RFC finding. Third, Geiser argues that the testimony of the vocational expert was flawed because the administrative law judge did not include Geiser's headaches and fatigue in his hypothetical question to the vocational expert. Finally, Geiser argues that the administrative law judge erred by rejecting her subjective testimony without pointing to contrary medical evidence.

Geiser began treating with Dr. Carlson on December 22, 2004 for evaluation and treatment of

10

her migraine headaches.  (Tr. 530-532).  Dr. Carlson put Geiser on a migraine diet; recommended regular sleep, meals and exercise; advised her to stop smoking; and put her on 100 mg tablets of Riboflavin (Vitamin B2) and 40 mg tablets of Relpax[15] as needed.  (Tr. 531).

On February 23, 2005, Geiser again saw Dr. Carlson, who wrote, "She is doing much better on riboflavin 400 mg a day.  She has not had a headache for two weeks.  Relpax gives her excellent headache relief."  (Tr. 361).  Geiser saw Dr. Carlson on August 3, 2005.  (Tr. 284).  At this visit, Dr. Carlson suggested that Geiser consult her gynecologist to consider using birth control pills to help menstrual migraine headaches.  (Tr. 284).  Geiser saw Dr. Carlson again on March 1, 2006.  (Tr. 352).  The doctor wrote "[g]ood response to Relpax."  (Tr. 352).  Geiser next saw Dr. Carlson on September 27, 2006.  (Tr. 290).  At this visit the doctor wrote "[s]he continues to get intermittent migraine headaches that are relieved by Relpax."  (Tr. 290).  On October 11, 2006, Geiser again saw Dr. Carlson who wrote, "[h]er headaches are manageable.  She gets some help from the use of Relpax."  (Tr. 343).  At a February 21, 2007 visit with Dr. Carlson, he wrote that she is now experiencing some lightheadedness.  (Tr. 297).

On March 19, 2007, Geiser was admitted to Geisinger Medical Center because of an acute stroke.  (Tr. 263).

After Geiser's stroke, her condition changed, she began reporting fatigue to Dr. Carlson (and to her other physicians).  Two weeks after her stroke, on April 2, 2007, Geiser saw Dr. Carlson.  (Tr.

---

15.    Relpax (Eletriptan) "is used to treat the symptoms of migraine headache (severe throbbing headache that sometimes comes along with nausea and sensitivity to sound and light). Eletriptan is in a class of medications called selective serotonin receptor agonists. It works by reducing swelling of blood vessels in the brain, stopping pain signals from being sent to the brain, and blocking the release of certain natural substances that cause pain, nausea, and other symptoms of migraine. Eletriptan does not prevent migraine attacks or reduce the number of headaches you have." http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000238/ (Last accessed July 13, 2011).

233).  The doctor wrote:

> She recovered her strength.  She is doing well except for some fatigability.  She does not think that she is ready to return to work yet because of her tiredness and lack of energy. I gave her a slip to return to work on April 25, 2007, if she feels better by then.

(Tr. 334).

> Geiser next saw Dr. Carlson on May 23, 2007.  The doctor wrote:

> She is still bothered by marked fatigue.  She feels 'really tired and really sleepy' all the time.  She will fall asleep at any time during the day.  She had a migraine yesterday that caused blurred vision to persist in her right eye even through today.

> \*\*\*\*\*

> She is totally, permanently, and completely disabled from work.

> \*\*\*\*\*

> We will support her claim for Disability.

(Tr. 328-329).

At Geiser's June 27, 2007 visit, Dr. Carlson wrote, "[s]he feels tired all the time."  (Tr. 323). She sleeps for 12 hours a night and still feels exhausted."  (Tr. 323).  "She looks tired."  (Tr. 324). "She is totally, permanently, and completely disabled from work."  (Tr. 324).  Again at her November 24, 2007, March 5, 2008, March 19, 2008 and August 20, 2008 visits, Geiser complained to Dr. Carlson about her problems with fatigue.  (Tr. 522, 524, 526 and 528).

On December 9, 2008, Dr. Carlson completed a "Headaches Medical Source Statement of Functional Abilities and Limitations" form, which, presumably, is a form developed by Geiser's attorney.  Dr. Carlson wrote that Geiser experiences headaches approximately three times a week, that she is capable of "low stress jobs," would be absent from work more than three times a month and that she experiences headaches three times a week.  (Tr. 604-607).

According to her testimony, Geiser stated that Dr. Carlson prescribed Ritalin to help her

12

fatigue. (Tr. 41). Beginning in August 2008, Geiser began working the overnight shift at a nursing home. (Tr. 39, 41). She stated that she falls asleep at work. (Tr. 39). Geiser testified that she experienced eight or nine migraine headaches in the past year. (Tr. 46).

Geiser argues that there were conflicting statements, and that the administrative law judge erred by choosing to reject Dr. Carlson's opinion that Geiser experiences headaches three times a week and would be likely to miss work more than three days per month, while the administrative law judge accepted her hearing testimony that she experienced eight or nine migraine headaches last year and missed work only three days in the prior six months. Geiser further argues that the administrative law judge erred by failing to place emphasis on Geiser's testimony that her boss allows her to sleep at work to deal with her extreme fatigue.

The court does not find that Dr. Carlson's written statements conflict with Geiser's testimony. Dr. Carlson opined that Geiser experienced headaches three times per week, and Geiser testified that she experienced eight or nine migraines during the prior year. Not all headaches are migraine headaches, thus, Dr. Carlson's opinion can co-exist with Geiser's testimony. Additionally, Dr. Carlson opined that Geiser would likely miss work three days or more a month, while Geiser testified that she actually missed only three days of work in the prior six months. Again, it was not error to accept Geiser's factual testimony over Dr. Carlson's opinion; Gesier testified to what did happen, whereas Dr. Carlson opined as to what may happen. It was not error for the administrative law judge to accept the testimony of fact over opinion.

Geiser also argues that the administrative law judge rejected her testimony that she was only able to work because her boss allowed her to fall asleep at work. This argument fails. If the administrative law judge had held that Geiser had the residual functional capacity to work because she had been working, this argument may have some credence. But, in making his determination, the

13

administrative law judge relied on the medical records, and gave significant weight to the opinion of Dr. Carlson in the December 2008 "Headaches Medical Source Statement of Functional Abilities," in which he wrote that Geiser is capable of "low stress jobs." In prior medical records, from May and June of 2007, Dr. Carlson had written that Geiser was "totally, permanently and completely disabled from work." The most recent opinion from December 2008, from treating physician Dr. Carlson, written on a form prepared (presumably) by Geiser's counsel, is that Geiser is capable of "low stress work." The residual functional capacity found by the administrative law judge aligns with Dr. Carlson's opinion.

Geiser's second argument is that the administrative law judge erred by not including Geiser's headaches and fatigue in the residual functional capacity. At step two, the administrative law judge did include Geiser's chronic fatigue and headaches as severe impairments. In accordance with 20 C.F.R. §§ 404.1545 and 416.945, the administrative law judge must consider all of Geiser's medically determinable impairments in formulating her residual functional capacity. Although this court may have found Geiser to be slightly more limited than what the administrative law judge found, the administrative law judge's residual functional capacity is supported by substantial evidence. "Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). The administrative law judge considered Geiser's fatigue, her testimony that she goes back to sleep about an hour or so after waking in the morning, Geiser's testimony that she only had three unexcused absences from work in the prior six months, the testimony that she falls asleep at work, the prescription Ritalin that decreased fatigue, her testimony that she has had about eight or nine migraines in the past year, the prescription Relpax for migraines and Dr. Carlson's written statement that Geiser experiences approximately three headaches per week. (Tr. 16-18). The administrative

14

law judge fully examined the medical records, and there is substantial evidence to support the residual functional capacity found by the administrative law judge.

Geiser's third argument is that the testimony of the vocational expert was flawed. First, Geiser argues that the hypothetical the administrative law judge presented to the vocational expert was flawed because it did not include a limitation that Geiser is unable to complete a full workday or workweek due to her headaches and fatigue.

"[A] hypothetical question posed to a vocational expert must reflect all of a claimant's impairments." Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. Pa. 2005)(internal citations omitted).  However, "[w]e do not require an ALJ to submit to the vocational expert every impairment alleged by a claimant." Id.  "[T]he hypotheticals posed must "accurately portray the claimant's impairments and the expert must be given an opportunity to evaluate those impairments "as contained in the record." Id.  The administrative law judge asked:

> Let's assume a hypothetical individual with the same age, education and work experience as the claimant.  They'd be limited to a medium range of work as that term is defined under the regulations, be limited to occupations that require no more tha[n] occasional postural maneuvers such as balancing, stooping, kneeling, crouching, crawling and climbing on ramps and stairs, must avoid occupations that would require climbing on ladders and things such as that, must avoid occupations that require fine fingering, gross handling would be preserved, or overhead reaching, feeling, pushing and pulling with the upper extremities to include the operation of hand levers with no prolonged writing or keyboard work and would be limited to occupations which do not require exposure to dangerous machinery and unprotected heights or require a peripheral visual acuity or depth perception.  First of all, could such a person perform any of the claimant's past relevant work?

(Tr. 66).  The administrative law judge next asked:

> [F]or the next hypothetical, assume the foregoing limitations, but instead of a medium range of work, [the individual] would be limited to a light range of work as that term is defined under the regulations.  With the added limitations of being limited to occupations requiring no more than simple, routine, repetitive tasks performed in a fast paced production environment involving only simple work-related decisions and in general relatively few workplace changes and would be limited to occupations which require no more than occasional interaction with supervisors, co-workers and members of the general

15

public.  It appears that would preclude any past relevant work and particularly the phlebotomist position, but what about other jobs?

(Tr. 67-68).  The administrative law judge's final question[16] to the vocational expert was:

> And for the last hypothetical, assume the foregoing limitations and also consistent with the claimant's testimony up through the time she returned to full[-time] work and obviously to some extent afterwards, would also require breaks and absences at will and time off task at will due to symptomology assuming corroboration of the medical records and absences from work of up to three to five times a month.  Would there be any work for such a person?

(Tr. 68).  The questions the administrative law judge asked of the vocational expert reflected all of Geiser's impairments.  The administrative law judge's final question to the vocational expert included the limitations that Geiser's fatigue and/or headaches may cause.  The hypotheticals presented to the vocational expert were not legally insufficient.

Geiser also argues that the jobs the vocational expert identified did not comport with the elements given in the hypothetical presented by the administrative law judge.  Geiser argues that all three of the jobs the vocational expert put forth (tagger, video monitor, and garment trimmer) require more than "simple, routine, repetitive tasks involving only simple, work-related decisions." Additionally Geiser argues that the job of tagger requires constant reaching, handling and fingering; the job of garment trimmer requires constant reaching and the job of video monitor requires frequent talking and listening.

The first job the vocational expert included was that of "tagger" (also known as a ticketer). The Dictionary of Occupational Titles defines a ticketer as such:

229.587-018  TICKETER  (textile)

alternate titles: labeler; tagger; ticket stamper

---

16.    The administrative law judge also followed up with questions relating to "fine fingering," these questions are not relevant to Geiser's argument regarding fatigue and headaches.

DEFINITION:

Records or stamps information, such as price, size, style, color, and inspection results on tags, tickets, and labels, using rubber stamp or writing instrument. Pastes, staples, sews, or otherwise fastens tickets, tags, labels, or shipping documents to cloth or carpeting. May compute number of rolls of cloth to be produced from each lot to determine required number of tickets, tags, or labels. May trim excess threads from selvage (finished edge) of cloth, using scissors or shears. May keep records of production, returned goods, and personnel transactions.

GOE[17]: 05.09.03

---

[17]. Many youths and other jobseekers are unprepared for an effective job search because of a lack of knowledge about the kinds of jobs to look for. They have difficulty relating their interest, skills, and potentials to appropriate occupations. To be effective, vocational counselors must have sufficient information to match an individual's interest, temperaments, potential ability and other personal traits to specific career fields and work requirements.

The Guide for Occupational Exploration was designed by the US Employment Service to provide career counselors and other DOT users with additional information about the interests, aptitudes, entry level preparation and other traits required for successful performance in various occupations. The GOE is also useful in self-assessment and counselor-assisted settings to help people understand themselves realistically in regard to their ability to meet job requirements. Descriptive information provided for each work group assists the individual in evaluating his or her own interests and relating them to pertinent fields of work.

The GOE code assigned to a definition provides a link between the occupation defined and the GOE arrangement of occupations with similar interests, aptitudes, adaptability requirements, and other descriptors.

The GOE coding structure classifies jobs at three levels of consideration. The first level divides occupations according to twelve interest areas corresponding to interest factors identified through research conducted by the former Division of Testing in the US Employment Service. The interest factors, identified by a two-digit code, are defined in terms of broad interest requirements of occupations as well as vocational interests of individuals. The twelve interest areas are defined as follows:

01 Artistic 05 Mechanical 09 Accommodating

02 Scientific 06 Industrial 10 Humanitarian

03 Plants-Animals 07 Business Detail 11 Leading-Influencing

04 Protective 08 Selling 12 Physical Performing

(continued...)

STRENGTH: L - Light Work - Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible

GED[18]: R2 - LEVEL 2 - Apply commonsense understanding to carry out detailed but

---

17.   (...continued)

The interest areas are then subdivided into work groups (the second set of two digits within the six-digit GOE code). Each work group contains occupations requiring similar worker traits and capabilities in related work settings. The GOE contains descriptive information for each work group and identifies each occupation in the group with a four-digit code and title. In many interest areas, occupations that require the most education, training, and experience are in the first group, while those requiring less formal education or experience are listed in the last group.

Work groups are then subdivided into subgroups (the third two-digit set in the GOE code) of occupations with even more homogeneous interests, aptitudes, and adaptability requirements. Each subgroup is identified by its unique six-digit code and title. Individual occupations are listed alphabetically within subgroups. Some subgroups contain occupations from more than one industry, listed within alphabetized industries.

DICTIONARY OF OCCUPATIONAL TITLES, 4th Ed (2001), App. C.

18.   General Educational Development embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance. This is education of a general nature which does not have a recognized, fairly specific occupational objective. Ordinarily, such education is obtained in elementary school, high school, or college. However, it may be obtained from experience and self-study.

The GED Scale is composed of three divisions: Reasoning Development, Mathematical Development, and Language Development. The description of the various levels of language and mathematical development are based on the curricula taught in schools throughout the United States. An analysis of mathematics courses in school curricula reveals distinct levels of

(continued...)

uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

M1 - LEVEL 1 - Add and subtract two-digit numbers. Multiply and divide 10's and 100's by 2, 3, 4, 5. Perform the four basic arithmetic operations with coins as part of a dollar. Perform operations with units such as cup, pint, and quart; inch, foot, and yard; and ounce and pound.

L2 - LEVEL 2 - Reading: Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes. Writing: Write compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs. Speaking: Speak clearly and distinctly with appropriate pauses and emphasis, correct punctuation, variations in word order, using present, perfect, and future tenses.

SVP[19]: 2[20] ANYTHING BEYOND SHORT DEMONSTRATION UP TO AND

---

18.   (...continued)
progression in the primary and secondary grades and in college. These levels of progression facilitated the selection and assignment of six levels of GED for the mathematical development scale.

However, though language courses follow a similar pattern of progression in primary and secondary school, particularly in learning and applying the principles of grammar, this pattern changes at the college level. The diversity of language courses offered at the college level precludes the establishment of distinct levels of language progression for these four years.

Consequently, language development is limited to five defined levels of GED inasmuch as levels 5 and 6 share a common definition, even though they are distinct levels.
DICTIONARY OF OCCUPATIONAL TITLES, 4th Ed (2001), App. C.

19.   Specific Vocational Preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.
DICTIONARY OF OCCUPATIONAL TITLES, 4th Ed (2001), App. C.

20.   Level Time

(continued...)

INCLUDING ONE MONTH

DICTIONARY OF OCCUPATIONAL TITLES, 4th Ed (2001).

The second job the vocational expert included was that of "video monitor" (also known as surveillance-system monitor).  The Dictionary of Occupational Titles defines a video monitor as such:

379.367-010  SURVEILLANCE-SYSTEM MONITOR  (government ser.)

DEFINITION:

Monitors premises of public transportation terminals to detect crimes or disturbances, using closed circuit television monitors, and notifies authorities by telephone of need for corrective action: Observes television screens that transmit in sequence views of transportation facility sites. Pushes hold button to maintain surveillance of location where incident is developing, and telephones police or other designated agency to notify authorities of location of disruptive activity. Adjusts monitor controls when required to improve reception, and notifies repair service of equipment malfunctions.

GOE: 04.02.03

STRENGTH: S - Sedentary Work - Exerting up to 10 pounds of force occasionally

---

20.   (...continued)
1 Short demonstration only

2 Anything beyond short demonstration up to and including 1 month

3 Over 1 month up to and including 3 months

4 Over 3 months up to and including 6 months

5 Over 6 months up to and including 1 year

6 Over 1 year up to and including 2 years

7 Over 2 years up to and including 4 years

8 Over 4 years up to and including 10 years

9 Over 10 years
DICTIONARY OF OCCUPATIONAL TITLES, 4th Ed (2001), App. C.

(Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

GED: R3 - LEVEL 3 - Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

M1 - LEVEL 1 - Add and subtract two-digit numbers. Multiply and divide 10's and 100's by 2, 3, 4, 5. Perform the four basic arithmetic operations with coins as part of a dollar. Perform operations with units such as cup, pint, and quart; inch, foot, and yard; and ounce and pound.

L3 - LEVEL 3 - Reading: Read a variety of novels, magazines, atlases, and encyclopedias. Read safety rules, instructions in the use and maintenance of shop tools and equipment, and methods and procedures in mechanical drawing and layout work. Writing: Write reports and essays with proper format, punctuation, spelling, and grammar, using all parts of speech. Speaking: Speak before an audience with poise, voice control, and confidence, using correct English and well-modulated voice.

SVP:   2 ANYTHING BEYOND SHORT DEMONSTRATION UP TO AND INCLUDING ONE MONTH

DICTIONARY OF OCCUPATIONAL TITLES, 4th Ed (2001).

The last job the vocational expert included was that of "garment trimmer" (also known as hand trimmer). The Dictionary of Occupational Titles defines a garment trimmer as such:

781.687-070 TRIMMER, HAND (any industry)
alternate titles: finisher; hand clipper

DEFINITION:

Trims ravelings, loose threads, or excess material from articles, such as garments, hosiery, textile products, embroidered articles, or bolts or rolls of cloth, using scissors. May scan trimmed articles for soiled spots and stitching and dyeing defects. May clean spots or stains from articles, using cleaning fluids, rags, brushes, or sponges. May be designated according to material trimmed as Cloth Trimmer, Hand (textile); Facing-End Trimmer (knitting).

GOE: 06.04.27
STRENGTH: L - Light Work - Exerting up to 20 pounds of force occasionally, and/or up

21

to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible

GED: R2 - LEVEL 2 - Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

M1 - LEVEL 1 - Add and subtract two-digit numbers. Multiply and divide 10's and 100's by 2, 3, 4, 5. Perform the four basic arithmetic operations with coins as part of a dollar. Perform operations with units such as cup, pint, and quart; inch, foot, and yard; and ounce and pound.

L1 - LEVEL 1 - Reading: Recognize meaning of 2,500 (two-or-three syllable words. Read at rate of 95-120 words per minute. Compare similarities and differences between words and between series of numbers. Writing: Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses. Speaking: Speak simple sentences, using normal word order, and present and past tenses.

SVP: 2 ANYTHING BEYOND SHORT DEMONSTRATION UP TO AND INCLUDING ONE MONTH

DICTIONARY OF OCCUPATIONAL TITLES, 4th Ed (2001).

Geiser argues that all three jobs go beyond "simple, routine, repetitive tasks." The jobs of ticketer and trimmer are a GED level 2, which are defined as "apply[ing] commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." The job of video monitor is a GED level 3, which is defined as "apply[ing] commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form." DICTIONARY OF OCCUPATIONAL TITLES, 4th Ed (2001), App. C. "Deal with problems involving several concrete variables in or from standardized situations." Id. With respect to the jobs of ticketer and trimmer, which are both GED level 2, "the great majority of courts that have addressed [this issue, finding] that a limitation to simple, routine,

22

repetitive tasks is not inconsistent with a GED reasoning level of 2 in the DOT." Dana v. Astrue, 2010 U.S. Dist. LEXIS 95814 (D. Me. Aug. 24, 2010). Accordingly, the jobs of ticketer and trimmer are consistent with the administrative law judge's restriction of "simple, routine, repetitive tasks."

The job of video monitor (surveillance-system monitor) is a GED level of 3. This court found no precedent stating that a GED level of 3 requires more than completing "simple, routine, repetitive tasks." The court found one case where a vocational expert testified that the restriction of no more than "simple, routine, repetitive tasks" precluded the position of surveillance-system monitor, see Rodgers v. Astrue 2011 U.S. Dist. LEXIS 48906, *8-9 (E.D. North Carolina April 13, 2011) (Webb, J.), and thirteen cases in which the vocational expert testified, and the district court or magistrate judge accepted, that an individual limited to a restriction of "simple, routine repetitive tasks" could still perform the job of surveillance-system monitor. See e.g., Hayes v. Astrue, 2011 U.S. Dist. LEXIS 26855, *4-5 (S.D. Ohio March 15, 2011) (Beckwith, J.); Green v. Astrue, 2010 U.S. Dist. LEXIS 125864, *11-12 (W.D. Pa. November 30, 2010) (Ambrose, J). (finding that it is inconsistent with the Social Security Rulings to rely on maximum reasoning levels as defined by the DOT to argue that the mental demands of surveillance system monitor exceed those for simple work); Krahner v. Comm'r of Soc. Sec., 2010 U.S. Dist. LEXIS 29160, *35 (M.D. Florida January 5, 2010) (Spaulding, J), Zavilla v. Astrue, 2009 U.S. Dist. LEXIS 96369, *27-28 (W.D. Pa. October 16, 2009) (Fischer, J.); Will v. Astrue, 2009 U.S. Dist. LEXIS 34924, *14 (W.D. Pa. April 24, 2009) (McLaughlin, J.); Popp v. Astrue, 2009 U.S. Dist. LEXIS 29699, *8 (W.D. Pa. April 7, 2009) (Bloch, J.); Fligge v. Astrue, 2009 U.S. Dist. LEXIS 28919, *32-33 (W.D. Pa. April 1, 2009) (Schwab, J.); Carrington v. Astrue, 2008 U.S. Dist. LEXIS 75047, *9 (W.D. Pa. September 29, 2008) (Cercone, J.); Harris v. Astrue, 2008 U.S. Dist. LEXIS 107369, *2-3 (M.D. Florida September 7, 2008) (Wilson, J.); Smolka v. Comm'r of Soc. Sec., 2008 U.S. Dist. LEXIS 55055, *6-7 (W.D. Pa. July 14, 2008) (Lancaster, J.);

Bailey v. Astrue, 2008 U.S. Dist. LEXIS 121018, *9 (W.D. Pa. June 26, 2008) (Baxter, J.); Sherriff v. Astrue, 2008 U.S. Dist. LEXIS 42775, *14 (W.D. Pa. May 30, 2008) (Conti, J.); Bush v. Barnhart 279 F. Supp. 2d 512, 517 (D. De. 2003) (unpublished).

Clearly, none of these cases holds controlling weight, as none of the fourteen cases dealt with the specific issue at hand - can an individual with a restriction of "simple, routine, repetitive tasks" work as a surveillance-system monitor with a GED Level of 3, which requires the ability to "apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form[, and] deal with problems involving several concrete variables in or from standardized situations." Although none of these cases is precedential, nevertheless, it is noteworthy that 13 of the 14 vocational experts in the above listed cases found that an individual restricted to "simple, routine, repetitive tasks" could perform work as a surveillance-system monitor. This court is inclined to hold the same way. Applying "commonsense understanding to carry out instructions" does not appear to be precluded by the limitation of "simple, routine, repetitive tasks."

Next, Geiser argues that the job of tagger, requires "constant reaching, handling and fingering." The residual functional capacity found by the administrative law judge restricted Geiser to "avoid[ing] occupations that require fine fingering (gross handling preserved), overhead reaching. . ." (Tr. 15). The definition of tagger does not appear to be out of line with Geiser's residual functional capacity. She also argues that the job of garment trimmer requires "constant reaching." Once again, based on the definition of garment trimmer in the dictionary of occupational titles, it does not appear that the job requires "constant reaching." Finally, Geiser argues that the job of video monitor requires "frequent talking and listening." Once again, the definition of video monitor does not seem to require "frequent talking and listening" and appears to align with Geiser's residual functional capacity.

Geiser's final argument is that the administrative law judge rejected her subjective testimony

24

without pointing to contrary medical evidence.  Specifically, Geiser argues that the administrative law judge rejected her testimony about debilitating fatigue, headaches and dizziness by relying, in part, on Geiser's return to work in August 2008.  Geiser argues that she was only able to work because her employer made special accommodations for her.  Geiser also argues that her work attempt should have been considered a trial work period.  Finally, Geiser argues that the administrative law judge erred by rejecting her testimony because her "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty."  (Tr. 18).

"In order for an ALJ to reject a claim of disabling pain, he must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record."  Sternberg v. Comm'r of Soc. Sec., 2011 U.S. App. LEXIS 14937 (3d Cir. N.J. July 19, 2011) (not precedential) citing Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir. 1990).  In regards to the fatigue, headaches and dizziness, the administrative law judge did look to the medical evidence to support his conclusion rejecting Geiser's credibility.  Specifically, the administrative law judge cited the Ritalin that helped decrease Geiser's fatigue, the "Headaches Mecial Source Statement of Functional Abilities," in which Dr. Carlson stated that Geiser had three headaches per week, and records from March 2005 that state that Geiser's dizzy spells have "improved significantly" since the Gamma Knife Radiosurgery."  (Tr. 16-17).

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner denying Geiser disability insurance and supplemental security income benefits.

Dated: July 26, 2011

_____
United States District Judge

25

# UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

JENNIFER LYNN GEISER,                        :
                                             :
        Plaintiff              :
                                             :    No. 4:10-CV-1973
    v.                                     :
                                             :    (Judge Nealon)
MICHAEL J. ASTRUE, COMMISSIONER :
OF SOCIAL SECURITY,                          :
                                             :
        Defendant              :

## ORDER

**AND NOW**, this 26th day of July, 2011, **IT IS HEREBY ORDERED THAT**:

1.    The Clerk of Court shall enter judgment in favor of the Commissioner and against Jennifer Lynn Geiser as set forth in the following paragraph.

2.    The decision of the Commissioner of Social Security denying Jennifer Lynn Geiser disability insurance benefits and social security income benefits is affirmed.

3.    The Clerk of Court shall **CLOSE** this case.


_____
**United States District Judge**